UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| MICHAEL D. BARNES, ) | |
| ) | |
| Petitioner, ) | 3:08-cv-00015 JWS |
| ) | |
| vs. ) | ORDER AND OPINION |
| ) | |
| PETE GEREN, SECRETARY OF THE ) | [Re: Report and Recommendation |
| UNITED STATES ARMY, *et al.*, ) | at Doc. 48; Petition at Doc. 1] |
| ) | |
| Respondents. ) | |
| ) | |

## I.  MATTERS PRESENTED

Petitioner Michael D. Barnes filed a petition for a writ of habeas corpus and writ of mandamus by a person in military custody pursuant to 28 U.S.C. §§ 2241(c) and 1361.[1] Respondents Pete Geren, Secretary of the United States Army, *et al.*, opposed the petition.[2] After hearing oral argument, Magistrate Judge John D. Roberts filed an initial report and recommendation, recommending that the court grant the petition and order respondents "to grant petitioner an honorable discharge consonant with his service record and his status as a conscientious objector."[3]  Respondents objected to

---

[1]Doc. 1.

[2]Doc. 25.

[3]Doc. 41 at p. 26.

the magistrate judge's recommendation.[4]  Magistrate Judge Roberts filed his final report and recommendation, declining to modify his initial recommendation.[5]  Respondents objected.[6]  Oral argument was requested but denied on the grounds that additional oral argument would not assist the court.[7]

## II.  STANDARD OF REVIEW

The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."[8]  When reviewing a magistrate judge's report and recommendation in a habeas case, the district court reviews *de novo* conclusions of law[9] and findings of fact to which parties object.[10]  The court reviews for clear error uncontested findings of fact.[11]  Here, because respondents objected to the "entirety" of the findings of fact and essentially all of the conclusions of law in the report and recommendation, the court's review is *de novo*.  Consequently, the court will make its own findings of fact and conclusions of law.

## III.  BACKGROUND

On March 31, 2005, petitioner Michael D. Barnes enlisted in the Army for five years as a Special Forces recruit.[12]  In September 2006, Barnes and his unit were deployed to Kuwait.[13]  About one month later, Barnes was sent to Iraq and assigned to

---

[4]Doc. 43.

[5]Doc. 48.

[6]Doc. 51.

[7]Doc. 55.

[8]28 U.S.C. § 636(b)(1).

[9]*Barilla v. Ervin*, 886 F.2d 1514, 1518 (9th Cir. 1989), *overruled on other grounds by Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996).

[10]28 U.S.C. § 636(b)(1).

[11]*Taberer v. Armstrong World Indus., Inc.*, 954 F.2d 888, 906 (3d Cir. 1992).

[12]Administrative Record ("AR") 116-122.

[13]AR 57.

-2-

the Tactical Operations Center ("TOC") as a radio operator. While in Iraq, Barnes became increasingly conflicted about his religious beliefs and his military service.[14] In November and December of 2006, psychiatrist Scott Moran treated Barnes for depressed mood. Dr. Moran opined that "much of [Barnes'] emotional distress was related to his service in the Army and to his religious concerns about being in the Army."[15] Dr. Moran further opined that "Barnes' symptoms will not improve until the psycho-social and spiritual stressors that are causing his symptoms are eliminated."[16]

In early December 2006, Barnes contacted the GI Rights Hotline and talked with Alison Carter about "his concerns about reconciling his Christian faith with his continuing service in the military."[17] At Barnes' request, Carter e-mailed him a conscientious objector ("CO") application on December 13, 2006.[18] Barnes began drafting his application.[19] On December 20, 2006, a squad leader in Barnes' unit was killed in combat and a gunner wounded. On December, 21, 2006, Sergeant Major Maggard ordered Barnes to replace the gunner.[20] On December 22, 2006, Barnes identified himself as a CO to his chain of command.[21]

On January 1, 2007, Barnes submitted his application for discharge from the Army on the basis of conscientious objection. Barnes requested that he be given a noncombatant job pending the decision on his CO application.[22] Pursuant to Army

---

[14]AR 57-58.

[15]AR 34.

[16]AR 34.

[17]AR 25.

[18]AR 25-26.

[19]AR 67.

[20]AR 113.

[21]AR 102, 67.

[22]AR 96.

-3-

Regulation 600-43, Chaplain Andrew Lawrence interviewed Barnes on January 4, 2007. Lawrence's report stated in pertinent part:

> SPC Barnes' convictions arise out of what he describes as his non-denominational Christian faith, morals and beliefs - his core values - which have developed over the last six months of daily prayer and scripture reading. While CO is not a requirement of Christian practice, it is consistent with both Christian Scripture and lived tradition. SPC Barnes has had minimal participation with organized faith communities since his conversion at age 19. His faith is individualistic and less communal in nature...
>
> SPC Barnes gives the appearance of genuine sincerity in his Christian beliefs. The consistency of his demeanor and general lifestyle indicate this sincerity. Moreover, his willingness to face the consequences of his seeking CO status, regardless of the cost, lends credence to the veracity of his claim. During the interview, SPC Barnes spoke with passion when questioned on his personal conviction and individual beliefs. His concern with "his soul" leads him to avoid profanity and other behaviors he considers spiritually harmful and which might affect his individual salvation. SPC Barnes previously worked as a counselor to troubled youth and indicated he would seek to work in similar causes in the future should his CO status be approved.[23]

Chaplain Lawrence noted some inconsistencies between Barnes' beliefs and action, such as Barnes' "emphasis on personal and individualistic faith as opposed to corporate Christian action and peacemaking." Lawrence stated, "These inconsistencies may reflect his immaturity in belief and his ongoing process of Christian values formation."[24]

On January 13, 2007, Barnes underwent a mental health examination by Major Overstreet pursuant to Army Regulation 600-43. Major Overstreet concluded that Barnes had the mental capacity to understand and participate in the CO proceeding and found that he had no mental condition which would contribute to a mental health diagnosis.[25]

On January 14, 2007, Colonel Garrett appointed Major Clay as the Investigating Officer ("IO") for Barnes' CO application. On January 23, 2007, Major Clay conducted

---

[23]AR 102.

[24]AR 102.

[25]AR 103.

-4-

an informal hearing regarding Barnes' application. By memorandum dated January 23, 2007, Major Clay recommended that Barnes' CO application be denied on the basis that "by definition of [Army Regulation] 600-43, he is not a conscientious objector."[26]

Having reviewed Barnes' application and the findings and recommendations of IO Clay, Captain Hopkins and Colonel Garret recommended disapproval of Barnes' CO application on February 3, 2007. On February 18, 2007, Staff Judge Advocate Holly O'Grady Cook sent Barnes' application packet back to Major Clay because of Clay's failure to follow the procedural requirements of Army Regulation 600-43. Staff Judge Advocate Cook specifically stated that 1) it was unclear whether the hearing transcript accurately summarized witness testimony, 2) Clay's broad conclusions did not appear to be based on the facts contained in the entire record, and 3) Clay's memorandum did not state the underlying basis of Barnes' professed conscientious objection or the time period in which his belief became fixed.[27] In a second memorandum dated February 22, 2007, Major Clay responded to the concerns raised by Judge Advocate Cook. Barnes submitted a rebuttal to Major Clay's first and second memorandums.[28] In a memorandum dated February 23, 2007, Cook indicated that she had reviewed Barnes' CO application again and found that all the procedural safeguards of Army Regulation 600-43 had been met. Cook recommended that Barnes' application be denied in accordance with his chain of command's recommendations. Cook specifically stated, "PFC Barnes has failed to show by clear and convincing evidence that by reason of religious training and belief, he sincerely objects to participation in war in any form and that his religious convictions prevent him from fulfilling his service obligation."[29]

On February 23, 2007, Commanding Major General Fils recommended disapproval of Barnes' application, stating that Barnes had "failed to provide clear and convincing evidence that his claim comes within the criteria of [Army Regulation] 600-

---

[26]AR 20.

[27]AR 15.

[28]AR 5, 22.

[29]AR 12.

43, and that his beliefs are sincere."[30]  Barnes' application then went before the Department of the Army Conscientious Objector Review Board ("DACORB") for review. On September 5, 2007, DACORB disapproved Barnes' CO application by a vote of two to one.[31]  As DACORB's decision is the Army's final administrative decision, Barnes has exhausted his administrative remedies, and his petition for writ of habeas corpus is ripe for review.

## IV.  DISCUSSION

To establish a claim for CO status, Barnes must show that "he is opposed to all wars, that his opposition is based on religious or moral training and belief, and that he is sincere in his beliefs."[32]  "Once the applicant has asserted a prima facie claim for conscientious objector status, the burden of proof shifts to the government to demonstrate 'a basis in fact' for denial of his application."[33]  Under basis-in-fact review, which has been described as the "narrowest review known to the law," the court does not weigh the evidence or ask whether there is substantial evidence to support denial of the CO application.[34]  The court must affirm if the record reveals "some proof that is incompatible with the applicant's claim."[35]

The court first considers whether Barnes established a prima facie claim for CO status.  In his application for CO status, Barnes stated:

> I am seeking separation from the military service because I do not believe in war or the military lifestyle that prepares for and supports war.  I am a Christian and being part of the military, which supports and wages war goes against my faith, morals, and beliefs.  My spirit (conscience) is tormented by my involvement in the support of war and it is severely affecting me .... Spending my time on this earth

---

[30] AR 11.

[31] AR 1.

[32] *Roby v. United States Department of the Navy*, 76 F.3d 1052, 1058 (9th Cir. 1996).

[33] *Koh v. Secretary of the Air Force*, 719 F.2d 1384, 1385 (9th Cir. 1983).

[34] *Id.*

[35] *Roby*, 76 F.3d at 1058 (citing *Woods v. Sheehan*, 987 F.2d 1454, 1456 (9th Cir. 1993)).

Case 3:08-cv-00015-JWS   Document 56   Filed 09/22/08   Page 6 of 16

killing or supporting killing others is unacceptable to me. By killing, you take away that person's chance of changing and becoming saved by the Lord ... I believe that I must live my life as similar to Jesus as I can. Love is the most important to me and I must practice loving not only my friends, but my enemies as well. I must be forgiving and willing to turn the other cheek, not acting (or even thinking) violent, aggressive or vengeful. I must be humble, not demanding, arrogant, or proud. I must try to save souls not help take them. Being in the military and supporting war prevents me from doing these things and troubles my soul. The purpose of my life in this world is to choose my eternity. I fear not for my life, but for my soul.[36]

Taking Barnes' allegations as true, he has presented a prima facie claim for CO status. He alleged an opposition to participate in war in any form, his opposition is founded on his religious beliefs, and his beliefs are sincere and deeply held.[37] The issue thus is whether the Army had a basis in fact for denying Barnes CO status.

Two of the three participating members of DACORB recommended disapproval of Barnes' application, citing the following reasons: 1) while there is evidence that Barnes is a sincere Christian, "nothing" in his CO application provides clear and convincing evidence of a sincere opposition to war in any form; 2) Barnes' previous attitude as an infantryman and desire to fight in Iraq cast doubt on the sincerity of his opposition; 3) the statements of his chain of command do not support granting CO status; 4) "[h]is explanation of his beliefs and lifestyle changes were weak, described in generalities, not supported by actions and appear more as afterthoughts, rather than a lifestyle change"; and, 5) the timing of his application is suspect.[38] Where, as here, the issue is the sincerity of the CO applicant's belief, "there must be some inference of insincerity or bad faith."[39]

First, there is no basis in fact for DACORB's assertion that "nothing" in Barnes' CO application provides clear and convincing evidence of a sincere opposition to war in any form based on his religious beliefs. Barnes' application clearly stated, "I do not

---

[36]AR 53.

[37]*Woods v. Sheehan*, 987 F.2d 1454, 1457 (9th Cir. 1993).

[38]AR 1-2.

[39]*Witmer v. United States*, 348 U.S. 375, 382 (1955).

believe in any war or the military lifestyle that prepares for and supports war. My participation in such goes against my faith in God, my Morals, and my Ethics."[40] In a letter to Captain Hopkins, Barnes also stated that he objects to "participation in war whatsoever."[41] When asked by IO Clay why he should be given CO status, Barnes replied, "My religious views do not support any war."[42]

In addition, the DACORB Staff Judge Advocate noted that "Barnes' supporting letters from friends and relatives suggest that he has a sincere opposition to war [in] any form."[43] While the Staff Judge Advocate discredited the supporting letters based on Barnes' "previous attitudes as an infantryman, his desire to fight in Iraq, the timing of his CO application and the statements of his chain of command,"[44] the DACORB Staff Chaplain, who recommended approval of Barnes' CO application, asserted that "[t]he statements of those that know him best validate the internal conflict between his faith beliefs and his service in the Army." The Staff Chaplain further submitted that Barnes' "resolve to not participate in engaging the enemy is based on his religious convictions."[45] Based on the above evidence, the court concludes that there is no basis in fact for DACORB's assertion that "nothing" in Barnes' CO application provides clear and convincing evidence of a sincere opposition to war in any form.

Second, there is no support for DACORB's finding that Barnes' previous attitude as an infantryman and desire to fight in Iraq cast doubt on the sincerity of his beliefs. While the evidence shows that at one time Barnes was a highly motivated infantry paratrooper, the evidence also shows that during the period when Barnes' CO beliefs

---

[40]AR 53.

[41]AR 96.

[42]AR 110.

[43]AR 1.

[44]AR 1.

[45]AR 1.

-8-

crystallized, his motivation changed. Statements from SPC Schreiber,[46] Specialist Flinner,[47] and Staff Sergeant Blough[48] all testify to the change in Barnes' motivation. For example, SPC Schreiber wrote:

> I started working with PFC Barnes, Michael early in this deployment in Kuwait. From those experiences with PFC Barnes I always viewed him as a very motivated high-speed paratrooper. It seemed like every time I went to see what he was doing he always had [] eyes in a Bible or a training book. He constantly was viewing his life in the eyes of the Christian religion. Also he was thinking & planning about the enemy tactics and ways to prevent the imaginable from happening. He was the text book soldier any team leader would want. I began to notice big changes in PFC Barnes as a soldier after he had been switched to Bde. RTO. PFC Barnes found he had more time to read up on the Christian religion & learned that his life was more valuable helping others rather than hurting them. I've seen PFC Barnes every morning in the TOC and every morning he seems the exact opposite in which I previously viewed him. He is now unmotivated & never jokes around like we used to. I write this letter only to protect his life & the life of fellow American soldiers.[49]

Similarly, Dr. Moran, who treated Barnes from November to December of 2006, noted Barnes' emotional distress "related to his service in the Army and to his religious concerns about being in the Army" and his "low motivation to continue to serve."[50] On the other hand, statements from Barnes' chain of command about Barnes' desire to be in infantry and "back on the line" were based on comments Barnes made prior to November and December of 2006 when his CO beliefs crystallized. Rather than suggesting a lack of sincerity, the shift in Barnes' attitude and motivation was consistent with his deepening faith and increasing internal struggle about supporting war.

Third, contrary to DACORB's assertion, the statements of Barnes' chain of command do not provide a basis in fact for a finding of insincerity. As indicated above, two of the statements refer to Barnes' attitudes as an infantryman prior to the

---

[46]AR 90.

[47]AR 91, 115.

[48]AR 33.

[49]AR 90.

[50]AR 34.

crystallization of his CO beliefs in November and December of 2006. Lieutenant Colonel Warren's statement, which is undated, refers to Barnes' expressed desire to be "back on the line" when he was assigned to the TOC in October 2006. Warren indicates that he subsequently left Barnes' unit and was surprised to hear that Barnes told Sergeant Major Maggard that he was a CO and did not want to participate in war in late December 2006. Warren also stated that he talked with Barnes in early January 2007, and Barnes told him that "he had done a lot of reading while on duty and it had changed his opinion and beliefs" and "he no longer believed in the war or in killing because his religious views had changed." Warren asked Barnes if he routinely attended Chapel services and Barnes said he did not. Warren opined that it seemed "odd" that "someone with such strong and renewed Christian beliefs did not attend church."[51] Warren's statement, for the most part, provides support for the sincerity of Barnes' beliefs. While Warren questioned the fact that Barnes did not attend routinely attend chapel, Army regulations specifically provide that "[c]hurch membership or adherence to certain theological tenets are not required" for CO status.[52]

      Staff Sergeant Miller's statement, which is dated January 19, 200[7], indicated that while he worked with Barnes during the prior year, Barnes "always stated that he is an infantry soldier and should be doing infantry tasks." However, Miller acknowledged that when Barnes began working with TOC in Iraq, the crystallization period of Barnes' beliefs, Barnes was assigned to the night shift and Miller was assigned to the day shift.[53] Miller's statement does not provide a basis in fact for denying Barnes' CO application because Miller did not have contact with Barnes during the period his CO beliefs crystallized.

      Sergeant Major Maggard's statement indicated that he informed Barnes on December 21, 2006, that he was being reassigned to the Personal Security Detachment. Maggard stated that when Barnes indicated that he would not perform the

---

[51]AR 112.

[52]Army Regulation 600-43 ¶1-5(b).

[53]AR 114.

Case 3:08-cv-00015-JWS   Document 56   Filed 09/22/08   Page 10 of 16

assigned duties, "[h]is only explanation was that he no longer agreed to the mission in Iraq." Maggard further stated that Barnes was returned to Kalsu around December 26, 2006, after making statements to various non-commissioned officers that he was a conscientious objector. Maggard concluded, "PFC Barnes refused to follow direction on the 21st of December by not performing duties with in the PSD and PFC Barnes' refusal to do as I instructed him bring[s] great discredit to himself and can not be allowed in an organization of the United States Army."[54]

There is no evidence in the record to support Maggard's suggestion that Barnes was motivated by his opposition to the mission in Iraq, rather than his opposition to war in general. To the contrary, Lieutenant Colonel Warren's statement confirms that Barnes told Sergeant Major Maggard that he was a CO and did not want to participate in war in late December 2006. Moreover, one opposed to war in any form would necessarily be opposed to the mission in Iraq.

While it is clear that Barnes' chain of command disapproved of his decision to seek CO status, the statements of Barnes' chain of command fail provide a basis in fact for a finding of insincerity or bad faith. Furthermore, the Ninth Circuit has recognized "how extremely difficult it is for career military personnel to accept as sincere convictions of persons such as [Barnes] when those views are directly opposed to their own."[55]

The fourth proffered basis for denying Barnes' application is that Barnes' explanation of his beliefs and his lifestyle changes were "weak." While the evidence suggests that Barnes may not be polished in stating his religious beliefs, it is well established under both Army regulations and applicable case law that one need not have sophisticated religious beliefs to qualify as a CO.

> Beliefs can be deeply held even though they lack sophistication. Care must be taken to avoid the inference that an applicant who lacks sufficient insight or knowledge to express his or her beliefs clearly does not hold the beliefs, or that

---

[54] AR 113.

[55] *Richmond v. Larson*, 476 F.2d 1038, 1042 (9th Cir. 1973).

-11-

they are no "religious" in origin or held with the strength of traditional religious convictions.[56]

Furthermore, both the DACORB Staff Chaplain and Chaplain Lawrence, who interviewed Barnes, found his religious convictions to be sincere, if not fully mature. The DACORB Staff Chaplain stated, "Though I do not perceive PFC Barnes' faith to be mature in its thought process, it does seem to be the driving force behind his decision. His resolve to not participate in engaging the enemy is based on his religious convictions."[57] Similarly, Chaplain Lawrence opined that "SPC Barnes gives the appearance of genuine sincerity in his Christian beliefs" and noted that he "spoke with passion when questioned on his personal conviction and individual beliefs." While he noted that Barnes responded with "generalities rather than specificity" when questioned about his political and philosophical beliefs and their connections to faith, and that he emphasized "individualistic faith as opposed to corporate Christian action," Chaplain Lawrence suggested these "inconsistencies may reflect his immaturity in belief and his ongoing process of Christian values formation."[58]

DACORB's assessment of Barnes' lifestyle changes as "weak" is also not supported by the record. Chaplain Lawrence observed that Barnes' "concern with 'his soul' leads him to avoid profanity and other behaviors he considers spiritually harmful and which might affect his individual salvation." Chaplain Lawrence also stated that Barnes' demeanor and his general lifestyle indicate the sincerity of his Christian belief, and "his willingness to face the consequences of his seeking CO status, regardless of the cost, lends credence to the voracity of his claim."[59]

In addition, Chaplain Lawrence indicated that "Barnes previously worked as a counselor to troubled youth and indicated he would seek to work in similar causes in the

---

[56]Army Regulation 600-43, Section II, Terms, "Religious training and belief"; *see e.g.*, *Helwick v. Laird*, 438 F.2d 959, 964 (5th Cir. 1971) ("One does not have to be a St. Augustine or a Thomas Aquinas to qualify as a conscientious objector.")

[57]AR 1.

[58]AR102

[59]AR 102.

Case 3:08-cv-00015-JWS   Document 56   Filed 09/22/08   Page 12 of 16

future should his CO status be approved." In his CO application, Barnes also asserted that he had planned to secure a job in law enforcement after his military service, but now wants to serve the Lord "by working with juveniles in the justice system as a residential counselor or maybe Probation officer."[60] Based on the record, there is no basis in fact for DACORB's finding that Barnes' explanation of his religious beliefs and his lifestyle changes were "weak."

The sole remaining basis for rejection of Barnes' CO application is DACORB's finding that the timing of his CO application "is in question." DACORB specifically stated, "His unit deployed to Iraq in September 2006, however, he did not officially apply for CO status until 11 January 2007."[61] The Ninth Circuit has repeatedly held that "'a delayed but timely filing of a conscientious objector application does not standing alone, provide a sufficient factual basis to support a finding of insincerity."[62]

In *Richmond v. Larson*, the Ninth Circuit held that "crystallization of conscientious objector views upon receipt of orders to Viet Nam [was] not an indicium of insincerity," reasoning that it was Richmond's "orders that compelled him to resolve his conflict and to make his choice between duty to the Army and duty to his conscience."[63] Similarly, in *Tressan v. Laird*, the Ninth Circuit held that the fact that an officer had accepted a commission and the benefits of military medical residency, taken weaponry training, treated sick and injured military personnel without objection, and recently received orders to report to Viet Nam provided no basis in fact for the determination that the officer was insincere in his CO claim.[64] The Ninth Circuit based its ruling in part, on the

---

[60] AR 70.

[61] AR 2.

[62] *Christensen v. Franklin*, 456 F.2d 1277, 1278 (9th Cir. 1972); *LaFranchi v. Seamans*, 536 F.2d 1259, 1260 (9th Cir. 1976) (holding a "late crystallization of conscientious objector beliefs, standing alone, is not sufficient ground for denying a discharge").

[63] *Richmond v. Larson*, 476 F.2d 1038, 1042-43 (9th Cir. 1973).

[64] *Tressan v. Laird*, 454 F.2d 761, 762-63 (9th Cir. 1972).

officer's explanation of the late crystallization of his beliefs and his prolonged effort to reconcile the demands of his military commission with the demands of his conscience:

> Indeed, we think that it is consistent with sincerity that an officer would try to find some way to reconcile the demands of duty with the demands of conscience in such a fashion that both might be respected and that he would postpone repudiation of his military duty until it became clear that its demands made reconciliation impossible.[65]

Here, as in *Tressan*, the record reveals a prolonged effort on Barnes' part "to reconcile his increasing pangs of conscience with his concepts of the demands of military duty."[66] In addition, the reasons for Barnes' delay in filing his CO application "were explicitly set forth in his application and in a manner wholly consistent with the existence of conscientious objection."[67] Barnes' application stated in pertinent part:

> It was a long process that led to me understanding and accepting what I was feeling, but my continual prayers and bible studies brought me to realize that I must put the Lord first and priority must be to serve him and not worry about this life, but the next (going to heaven.) I struggled with some of the teachings in Basic training and Infantry school, specifically the killing and combat mindset, but tried to justify it and drove on.
>
> I have wanted to be a solider since I was a kid and enlisted in March 2005 as an 18x (Special Forces candidate). I planned on being a career soldier and signed up for 5 years. I had the idealist perception that I could serve the lord through my service by defending freedom and helping other people in countries no one else would help. I guess I wanted to do my part to save the world.
>
> When I arrived at Ft. Richardson, Alaska in September 2005 I was put in the 501st battalion. Here is when I really began to question my beliefs and whether or not I was living my life to serve the Lord...
> ....
>
> I was then deployed to Iraq at the end of September [2006]. While in Kuwait, I did my best to get myself mentally ready for combat, but still struggled with my depression and feeling that what I was doing was not right. I studied my bible daily and prayed looking for answers. About 1 month after being in Kuwait we

---

[65] *Id.* at 763.

[66] *Id.* at 762.

[67] *Strait v. Laird*, 464 F.2d 205, 207 (9th Cir. 1972).

-14-

were sent to Iraq and I was taken off the team and put in the TOC (tactical operations center) to run the radio. At first I was upset and requested that Brigade send me back to the 501st so [I] could do my job as a soldier. I now believe this was God intervening, not only to keep my physical body safe, but also my soul; my friends and family also believe this. God gave me the time he needed to talk to me (my soul) and let me figure out what I was feeling. He prevented me from taking part in actions or being involved in situations that would damage my soul (conscience). He opened my eyes to how I should be living and gave me the choice to follow him or not.
...

I have been in the TOC for about 1 month now and working 12 hour shifts. This has given me plenty of time to study the Bible and to confirm that my spirit has been troubling me because I am going against the Lord's will. The more I read the bible and related it to my life and how I should be living, the more I saw that what I am part of is wrong. All of the depression and misery I have been dealing with has been an inner conflict with being a soldier and serving the Lord. I have been trying to justify being a soldier and finding a way to do so while still being a Christian, because that is what I wanted to be since I was a kid, but I can no longer justify spending my short time in this world participating in or supporting war.[68]

Other evidence in the record, including the statements of family, friends, and other soldiers, as well as Dr. Moran's statement, reveal a prolonged effort on Barnes' part to reconcile his religious beliefs with his military service. "The lateness of crystallization under these circumstances is not an indicium of insincerity."[69]

There is no evidence in the record that Barnes' application was in response to an "undesirable assignment," rather than the result of sincerely held convictions. To the contrary, the record shows that Barnes talked with Alison Carter on the GI Rights Hotline in early December 2006 about "his concerns about reconciling his Christian faith with his continuing service in the military,"[70] Carter e-mailed him a conscientious objector ("CO") application on December 13, 2006,[71] and Barnes began drafting his

---

[68]AR 54-58.

[69]*Tressan*, 454 F.2d at 762.

[70]AR 25.

[71]AR 25-26.

-15-

application[72] before Sergeant Major Maggard ordered Barnes to replace a wounded gunner on December 21, 2006.[73] Here, as in *Tressan* and *Richmond*, it appears the receipt of that order "compelled [Barnes] to resolve his conflict and to make his choice between duty to the Army and duty to his conscience."[74]

For the foregoing reasons, the court concludes that the Army did not have a basis in fact for denying Barnes' CO application. The court further concludes that remand for further proceedings is not appropriate here because a careful examination of the record indicates no basis in fact under which the Army could have rebutted Barnes' prima facie case.[75]

## V. CONCLUSION

For the reasons set out above, the court adopts the final report and recommendation at docket 48 to the extent it is consistent with this opinion but otherwise rejects it, and **GRANTS** the petition for writ of habeas corpus at docket 1. The court further **ORDERS** that respondents shall forthwith grant petitioner a discharge consonant with his service record and his status as a conscientious objector.

DATED at Anchorage, Alaska, this 19th day of September 2008.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[72] AR 67.

[73] AR 113.

[74] *Richmond*, 476 F.2d at 1041.

[75] *Ward v. Volpe*, 484 F.2d 1230, 1235 (9th Cir. 1973).